1
2
3
4                     UNITED STATES DISTRICT COURT
5                          DISTRICT OF NEVADA
6                                 * * *
7    JOSE MENDOZA, JR., et al.,                Case No. 2:18-CV-959 JCM (DJA)
8                          Plaintiff(s),                    ORDER
9         v.
10   AMALGAMATED TRANSIT UNION
     INTERNATIONAL, et al.,
11
                          Defendant(s).
12

13
14        Presently before the court is Jose Mendoza ("Mendoza"), Robbie Harris, Robert Naylor,
15   Myeko Easley, Dennis Hennessey,[1] Gary Sanders, Linda Johnson-Sanders, Caesar Jimenez's
16   (collectively "plaintiffs") first motion to amend/correct.  (ECF No. 67).  Amalgamated Transit
17   Union International ("ATU"), Antonette Bryant, Lawrence J. Hanley, Tyler Home, James
18   Lindsay III, Keira McNett, Richie Murphy, and Daniel Smith (collectively "the ATU
     defendants") filed a response (ECF No. 73).  Magistrate Judge Carl Hoffman issued a report and
19   recommendation ("R&R"), recommending that the court deny plaintiffs' motion to amend.  (ECF
20   No. 117).
21
22        Also before the court is Judge Hoffman's order denying plaintiffs' motion to compel
23   (ECF No. 107) and granting their motion to clarify (ECF No. 114).  (ECF No. 117).  Plaintiffs
24   objected to the order.  (ECF No. 121).
25        Also before the court is Miller Kaplan Arase, LLP, Anne Salvador, and Alexandra
26   Chernyak's (collectively "the MKA defendants") motion for summary judgment.  (ECF No.
27
28
     _____
          [1] Dennis Hennessey appears individually and "on behalf of Amalgamated Transit Union
     Local 1637 membership, and as majority of the Local 1637 Executive Board."

**James C. Mahan**
**U.S. District Judge**

112).  Plaintiffs filed a response (ECF No. 115), to which the MKA defendants replied (ECF No. 120).

Also before the court is plaintiffs' countermotion to strike.  (ECF No. 125).  The MKA defendants did not file a response, and the time to do so has passed.

Also before the court are the ATU defendants' motions for summary judgment regarding the claims filed in *Mendoza I* (ECF No. 135) and *Mendoza II* (ECF No. 136).  Plaintiffs responded to both motions (ECF Nos. 147; 148), to which the ATU defendants replied (ECF Nos. 155).

Also before the court is Keolis Transit America, Inc. ("Keolis") and Kelvin Manzanares's (collectively the "KTA Defendants") motion for summary judgment.  (ECF No. 137).[2]  Plaintiffs filed a response (ECF No. 149), to which the KTA defendants replied (ECF No. 156).

Also before the court are plaintiffs' motions for partial summary judgment against the MKA defendants (ECF No. 139) and the ATU defendants (ECF No. 140).  The MKA defendants filed a response (ECF No. 146), to which plaintiffs replied (ECF No. 158).  The ATU defendants filed a response (ECF No. 145), to which plaintiffs replied (ECF No. 157).

Also before the court is plaintiffs' motion to reconsider.  (ECF No. 151).[3]  The ATU defendants filed a response (ECF No. 159), to which the KTA defendants joined (ECF No. 160) and plaintiffs replied (ECF No. 164).

**I.     Background**

This action arises from the investigation into, and subsequent imposition of trusteeship over, Amalgamated Transit Union Local 1637 ("Local 1637").

Article 4 of Local 1637's bylaws provided that the president would "be paid at a daily rate of 8 hours times the highest hourly rate paid to an employee in their job classification for 40 hours per week to perform the duties of the office."  (ECF Nos. 135 at 4; 135-26 at 57).  This means that the president would be paid at one of two rates: either the "operator rate" or the

---

[2] The KTA defendants separately filed a statement of facts in support of its motion for summary judgment.  (ECF No. 138).

[3] Plaintiffs file a corrected image of its motion.  (ECF No. 152).

1  higher "mechanic rate."  (ECF No. 135 at 4–5).  Thus, if a president was a coach operator, he

2  would be paid at "the highest hourly rate paid to" a coach operator; if he was a mechanic, he

3  would be paid at "the highest hour rate paid to" a mechanic.  *Id.*  In July 2011, Local 1637

4  rejected an amendment that would remove the reference to "their job classification," allowing the

5  president to be paid the highest mechanic rate regardless of whether he or she was an operate or a

6  mechanic.  *Id.* at 4.

7          Plaintiff Jose Mendoza was the president of Local 1637.  (ECF No. 8).  Mendoza was a

8  coach operator for Keolis.[4]  (ECF No. 137 at 2).  However, as president of Local 1637,

9  "Mendoza was on leave from Keolis and delegated to full-time union work while receiving the

10  standard benefits of the collective bargaining agreement between Keolis and Local 1637."[5]  *Id.*

11  In July 2011, Mendoza increased his salary to the highest mechanic rate, which amounted to a

12  40% pay raise, despite Local 1637 rejecting the amendment to the bylaws that would allow him

13  to do so.  (ECF No. 135 at 5). Mendoza contends that he paid himself the mechanic rate based

14  because "at some point in 2012 or 2013 he told International Representative Stephan

15  M[a]cDougall about his interpretation of the bylaw and that Representative M[a]cDougall

16  approved of [plaintiff] Mendoza's decision to authorize himself a salary at the higher mechanic's

17  rate."[6]  (ECF No. 147 at 14–15).

18          In 2012, Local 1637's financial secretary-treasurer sent Hanley, ATU's international

19  president, a copy of their most recent bylaws.  (ECF No. 135 at 5).  Mendoza personally

20  contacted Hanley on two occasions to confirm that those were the operative bylaws.  *Id.*  Those

21  bylaws changed the language—but not the effect—of the provision governing the president's pay

22

23  ─────────────────────

24      [4] Mendoza was initially employed by Veolia Transportation, the predecessor employer to
    Keolis and MV Transportation, to drive buses on Las Vegas Metropolitan Transit Authority bus
25  lines.  (ECF Nos. 135 at 4; 138 at 2).  When the bus lines Mendoza worked were assigned to
    Keolis and MV around 2013, Mendoza chose Keolis as his employer.  (ECF Nos. 135 at 4; 138
26  at 2).

27      [5] Because Mendoza was already the president of Local 1637 when he became employed
    by Keolis, his union leave meant that he never actually reported to Keolis for work.

28      [6] The court notes, like ATU did, that this conversation occurred, if at all, only after
    Mendoza began paying himself the mechanic rate.  (ECF No. 135 at 11).

James C. Mahan
U.S. District Judge

by adding the word "respective" before "job classification."[7]   *Id.* at 6.   Mendoza continued paying himself the mechanic rate.

In July 2016, a member of Local 1637 contacted Hanley regarding Mendoza's potentially over-paying himself.   *Id.*   Hanley opened an inquiry into the matter and contacted Mendoza regarding the situation.   *Id.*   Mendoza admitted that he had been paying himself at the mechanic rate, argued that he was entitled to the mechanic rate, and noted that International Representative MacDougall had purportedly agreed.   *Id.* at 6–7.   MacDougall "did not recall any such discussion," and Mendoza could provide no documentation showing that his salary increase had been approved.  *Id.* at 7.

Hanley concluded that Mendoza was entitled only to the operator rate, not the mechanic rate, and instructed Mendoza to reimburse[8] Local 1637 for the overpayment.   *Id.*   Notably, Hanley directed payment of only $5,865.60, "which was the amount of overpayment during the 13-week period after . . . Hanley first raised the matter with [Mendoza] . . . ."  *Id.* at 7 n.6.   ATU auditor Tyler Home calculated that Mendoza received roughly $144,909.08 in salary and vacation overpayments.  (ECF No. 147 at 3).

Mendoza then disputed the veracity of the 2012 version of the Local 1637 bylaws.  (ECF No. 135 at 8).   In response, Hanley noted that Mendoza had previously indicated that Local 1637 adhered to the 2012 bylaws and, more to the point, that he was overpaid regardless of whether the 2008 or 2012 bylaws were operative.  *Id.*

Then, in 2017, ATU received another complaint about the administration of Local 1637.  *Id.*   In response, Hanley, ATU internal auditor Tyler Home, and ATU International Vice President James Lindsay examined Local 1637's financial practices and records.   *Id.*   That review showed that Mendoza had been cashing out too much vacation time—5 weeks, rather than the maximum 2—and cashed out all of his vested leave every year, including vacation, paid

---

[7] Thus, the amended bylaws provided as follows: "The President-Business Agent shall be paid at a daily rate of 8 hours times the highest hourly rate paid to an employee in their **respective** job classification for 40 hours per week to perform the duties of the office."  (ECF No. 135-26 at 80) (emphasis added).

[8] Mendoza argues that this reimbursement request constitutes a disciplinary fine.  (ECF No. 147).

1    time off, and holiday pay. *Id.* at 8–9. Mendoza claimed that he never took vacations, never took

2    paid time off, and worked on every holiday. *Id.* at 9. Mendoza did not maintain any sort of

3    timesheet or weekly activity log to verify or support his assertion. *Id.*

4           In light of this apparent financial malfeasance, ATU imposed a temporary trusteeship

5    over Local 1637, as authorized by the ATU constitution and general laws ("CGLs"). *Id.* at 9–10.

6    When the temporary trusteeship was instituted, Local 1637's executive board members were

7    "suspended from their functions" by operation of ATU's CGLs; those functions were taken over

8    by the trustee. *Id.* at 9.

9           In accordance with ATU CGLs, ATU held an evidentiary hearing to determine whether

10   the trusteeship was justified and whether it should be continued. *Id.* at 10. A hearing officer,

11   ATU Representative Antonette Bryant, who was not involved in the decision to establish the

12   temporary trusteeship was appointed to oversee the hearing. *Id.* After an evidentiary hearing—

13   wherein Mendoza "made an opening statement, provided testimony on two separate

14   occasions . . . and gave a closing argument" and later "submitted a ten-page, single-spaced post-

15   hearing statement with 79 pages of attached exhibits"—Bryant issued her written report and

16   recommendation to ATU's General Executive Board ("GEB"). *Id.* at 10–11.

17          Bryant made detailed factual findings, determined that there was substantial evidence of

18   financial malfeasance, and ultimately concluded that the trusteeship was justified under ATU's

19   CGLs. *Id.* at 11–14. Thus, by operation of the CGLs, Local 1637's executive board members

20   were removed from their positions. *Id.* at 14–15. The trusteeship continued until new officer

21   elections were held in May 2018. *Id.* at 15.

22          When Mendoza was suspended from his position as president, he was no longer engaging

23   in full-time union work and, consequently, "ATU instructed him to report to Keolis for work and

24   notified Keolis of the trusteeship and Mendoza's removal from office." (ECF No. 138 at 2).

25   Mendoza contacted Keolis and requested a personal leave of absence in order to defend and

26   appeal the imposition of the trusteeship, which Keolis granted. (ECF No. 149 at 2). However,

27   Mendoza's commercial driver's license ("CDL")—which was required to return to work—had

28

**James C. Mahan**
**U.S. District Judge**

1   been suspended after Mendoza was convicted of driving under the influence in October 2016.

2   (ECF No. 138 at 3).  Mendoza never recertified for his CDL.  *Id.*

3   During Mendoza's personal leave of absence, Keolis attempted to contact Mendoza

4   regarding his DUI, CDL, and return-to-work date to no avail.  (ECF Nos. 137 at 3; 156 at 4–8).

5   After several attempts to get in contact with Mendoza, who did not have a CDL at the time,

6   Keolis terminated Mendoza's employment.  (ECF No. 138 at 3).  Mendoza filed a grievance with

7   Local 1637, which was forwarded to Keolis.  (ECF No. 149 at 7).

8   ATU and Keolis ultimately negotiated a settlement on Mendoza's behalf that allowed for

9   his reinstatement with Keolis provided that he recertify his CDL within five to seven days of the

10   ATU's receipt of this notice.  *Id.* at 8–9.  Mendoza did not accept the settlement.  *Id.* at 10.  At

11   the grievance hearing that followed, defendant Lindsay accepted the settlement on Mendoza's

12   behalf and without Mendoza's consent.  *Id.*  Mendoza's termination was finalized after he did

13   not recertify his CDL within the time limit set by the settlement.  *Id.*

14   Mendoza believes that the conduct described above was the result of a conspiracy by the

15   ATU defendants "to commit fraud in order to impose this trusteeship over Local 1637."  (ECF

16   No. 8 at 2).  On September 22, 2017, Mendoza initiated the first iteration of this action in state

17   court, which was removed to federal court on September 25, 2017.  *See Mendoza, Jr. v.*

18   *Amalgamated Transit Union International, et al.*, case no. 2:17-cv-2485-JCM-CWH, ECF No. 1

19   ("*Mendoza I*").

20   In *Mendoza I*, Mendoza's complaint set forth ten separate causes of action on behalf of

21   himself individually and on behalf of Local 1637 against the ATU defendants (excluding

22   Murphy): (1) breach of contract regarding defendants' alleged amending of Article 4 of the Local

23   1637 Constitution and failure to follow procedure in charging Mendoza; (2) breach of contract

24   regarding defendants' alleged fraudulent contravention of the ATU International Constitution

25   and Bylaws in implementing the trusteeship; (3) breach of implied covenant of good faith and

26   fair dealing; (4) fraudulent misrepresentation; (5) negligent misrepresentation; (6) legal

27   malpractice as to defendants Keira McNett and Daniel Smith; (7) breach of fiduciary duty; (8)

28   constructive fraud; (9) malicious prosecution; and (10) civil conspiracy.  *Id.*

James C. Mahan
U.S. District Judge

On May 25, 2018, plaintiffs filed the present action.  (ECF No. 1).[9]  Plaintiffs initially sued defendants ATU International, Lindsay, Hanley, Bryant, Murphy, McNett, Smith, and Home.  *Id*.  On July 13, 2018, plaintiffs filed a prolix amended complaint, adding thirteen (13) new causes of action and adding the MKA and KTA defendants.  (ECF No. 8).  Plaintiffs' amended complaint asserts a total of twenty-seven (27) causes of action indiscriminately against defendants.[10]  *Id*.  These claims are based on various federal and state statutes, including, *inter alia*, the Labor Management Relations Act ("LMRA"), the Labor-Management Reporting and Disclosure Act ("LMRDA"), and the Racketeer Influenced and Corrupt Organizations Act ("RICO").  *Id*.

On September 5, 2019—as the parties began filing and briefing the instant motions for summary judgment—the court granted various motions to dismiss.  (ECF No. 142).  The court dismissed all *Mendoza II* claims against the ATU defendants, dismissed all claims against the MKA defendants, and dismissed most claims against the KTA defendants.  *Id*.  Thus, only claims 1 and 2 from *Mendoza I* remain pending against the ATU defendants and only claims 10, 13, and 19 remain pending against the KTA defendants.  *Id*. at 19.  The motions for summary judgment are now ripe, and the court considers them as they pertain to the remaining claims.

## II.    Legal Standard

### a.  R&Rs

This court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate."  28 U.S.C. § 636(b)(1).  Where a party timely objects to a magistrate judge's report and recommendation, then the court is required to "make a de novo determination of those portions of the [report and recommendation] to which objection is made."  28 U.S.C. § 636(b)(1).

---

[9]  Because both *Mendoza I* and *Mendoza II* arose from the same controversy and involved exactly the same underlying facts, the court, after a hearing, consolidated the cases *sua sponte*.  (ECF Nos. 71; 74; 76).

[10]  To be clear, plaintiff brings certain claims against certain defendants, but the court and parties are left to guess as to the applicability of the remainder.  (*See generally* ECF No. 8).

1    Where a party fails to object, however, the court is not required to conduct "any review at

2    all . . . of any issue that is not the subject of an objection." *Thomas v. Arn*, 474 U.S. 140, 149

3    (1985).  Indeed, the Ninth Circuit has recognized that a district court is not required to review a

4    magistrate judge's report and recommendation where no objections have been filed.  *See United*

5    *States v. Reyna-Tapia*, 328 F.3d 1114 (9th Cir. 2003) (disregarding the standard of review

6    employed by the district court when reviewing a report and recommendation to which no

7    objections were made).

8        *b.   Review of magistrate judge orders*

9    A district judge may affirm, reverse, or modify, in whole or in part, a magistrate judge's

10   order, as well as remand with instructions.  LR IB 3-1(b).

11   Magistrate judges are authorized to resolve pretrial matters subject to the district judge's

12   review under a "clearly erroneous or contrary to law" standard.  28 U.S.C. § 636(b)(1)(A); *see*

13   *also* Fed. R. Civ. P. 72(a); LR IB 3-1(a) ("A district judge may reconsider any pretrial matter

14   referred to a magistrate judge in a civil or criminal case under LR IB 1-3, when it has been

15   shown the magistrate judge's order is clearly erroneous or contrary to law.").  The "clearly

16   erroneous" standard applies to a magistrate judge's factual findings, whereas the "contrary to

17   law" standard applies to a magistrate judge's legal conclusions.  *See, e.g.*, *Grimes v. Cty. of San*

18   *Francisco*, 951 F.2d 236, 240 (9th Cir. 1991).

19   A magistrate judge's finding is "clearly erroneous" if the district judge has a "definite and

20   firm conviction that a mistake has been committed."  *United States v. U.S. Gypsum Co.*, 333 U.S.

21   364, 395 (1948).  "[R]eview under the 'clearly erroneous' standard is significantly deferential."

22   *Concrete Pipe & Prod. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.*, 508 U.S. 602,

23   623 (1993).

24   "An order is contrary to law when it fails to apply or misapplies relevant statutes, case

25   law, or rules of procedure."  *United States v. Desage*, 2017 WL 77415, at *3, --- F. Supp. 3d ----,

26   ---- (D. Nev. Jan. 9, 2017) (quotation omitted); *see also Grimes*, 951 F.2d at 241 (finding that

27   under the contrary to law standard, the district judge reviews the magistrate judge's legal

28   conclusions *de novo*).

James C. Mahan
U.S. District Judge

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*c.   Reconsider*

A motion for reconsideration "should not be granted, absent highly unusual circumstances." *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 880 (9th Cir. 2009). "Reconsideration is appropriate if the district court (1) is presented with newly discovered evidence, (2) committed clear error or the initial decision was manifestly unjust, or (3) if there is an intervening change in controlling law." *School Dist. No. 1J v. ACandS, Inc.*, 5 F.3d 1255, 1263 (9th Cir. 1993); *see* Fed. R. Civ. P. 60(b).

Rule 59(e) "permits a district court to reconsider and amend a previous order," however "the rule offers an extraordinary remedy, to be used sparingly in the interests of finality and conservation of judicial resources." *Carroll v. Nakatani*, 342 F.3d 934, 945 (9th Cir. 2003) (internal quotations omitted). A motion for reconsideration is also an improper vehicle "to raise arguments or present evidence for the first time when they could reasonably have been raised earlier in litigation." *Marlyn Nutraceuticals*, 571 F.3d at 880.

*d.   Summary judgment*

The Federal Rules of Civil Procedure allow summary judgment when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

For purposes of summary judgment, disputed factual issues should be construed in favor of the non-moving party. *Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 888 (1990). However, to be entitled to a denial of summary judgment, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial." *Id.*

In determining summary judgment, a court applies a burden-shifting analysis. The moving party must first satisfy its initial burden. "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial. In such a case,

James C. Mahan
U.S. District Judge

1    the moving party has the initial burden of establishing the absence of a genuine issue of fact on

2    each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d

3    474, 480 (9th Cir. 2000) (citations omitted).

4         By contrast, when the nonmoving party bears the burden of proving the claim or defense,

5    the moving party can meet its burden in two ways: (1) by presenting evidence to negate an

6    essential element of the non-moving party's case; or (2) by demonstrating that the nonmoving

7    party failed to make a showing sufficient to establish an element essential to that party's case on

8    which that party will bear the burden of proof at trial. *See Celotex Corp.*, 477 U.S. at 323–24.  If

9    the moving party fails to meet its initial burden, summary judgment must be denied and the court

10   need not consider the nonmoving party's evidence.  *See Adickes v. S.H. Kress & Co.*, 398 U.S.

11   144, 159–60 (1970).

12        If the moving party satisfies its initial burden, the burden then shifts to the opposing party

13   to establish that a genuine issue of material fact exists.  *See Matsushita Elec. Indus. Co. v. Zenith

14   Radio Corp.*, 475 U.S. 574, 586 (1986).  To establish the existence of a factual dispute, the

15   opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient

16   that "the claimed factual dispute be shown to require a jury or judge to resolve the parties'

17   differing versions of the truth at trial."  *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*,

18   809 F.2d 626, 631 (9th Cir. 1987).

19        In other words, the nonmoving party cannot avoid summary judgment by relying solely

20   on conclusory allegations that are unsupported by factual data.  *See Taylor v. List*, 880 F.2d

21   1040, 1045 (9th Cir. 1989).  Instead, the opposition must go beyond the assertions and

22   allegations of the pleadings and set forth specific facts by producing competent evidence that

23   shows a genuine issue for trial.  *See Celotex*, 477 U.S. at 324.

24        At summary judgment, a court's function is not to weigh the evidence and determine the

25   truth, but to determine whether there is a genuine issue for trial.  *See Anderson v. Liberty Lobby*,

26   *Inc.*, 477 U.S. 242, 249 (1986).  The evidence of the nonmovant is "to be believed, and all

27   justifiable inferences are to be drawn in his favor."  *Id.* at 255.  But if the evidence of the

28

**James C. Mahan**
**U.S. District Judge**

1   nonmoving party is merely colorable or is not significantly probative, summary judgment may be

2   granted. *See id.* at 249–50.

3   **III.   Discussion**

4          As an initial matter, the court granted the MKA defendants' motion to dismiss (ECF No.

5   31) and granted the KTA defendants' motion to dismiss (ECF No. 51) in part.  (ECF No. 142).

6   As a result, the court denies the MKA defendants' motion for summary judgment (ECF No. 112)

7   as moot.  Because the court denies the MKA defendants' motion as moot, the court need not

8   consider the motion to strike attached therewith.  As a result, the court also denies plaintiffs'

9   countermotion to strike (ECF No. 125) as moot.  The court also denies the KTA defendants'

10  motion for summary judgment (ECF No. 137) as moot as it pertains to the now-dismissed sixth,

11  eighth, and ninth causes of action.

12            *a.  Plaintiff's appeal of Judge Hoffman's order and R&R*

13         First, plaintiffs appeal Judge Hoffman's order only insofar as it denies plaintiffs' motion

14  to compel and grants plaintiffs' motion to clarify.  (ECF No. 121).  Plaintiffs do not object to

15  Judge Hoffman's R&R that plaintiff's motion to amend (ECF No. 67) be denied.  (ECF No.

16  117).  Further, plaintiffs filed a second motion for leave to file a second amended complaint

17  (ECF No. 154), which Magistrate Judge Albregts denied at a December 12, 2019, hearing (ECF

18  No. 171).  Accordingly, the court adopts Judge Hoffman's recommendation (ECF No. 121) and

19  denies the motion to amend (ECF No. 67).

20         In the course of litigating *Mendoza II*, plaintiffs have moved to compel five times.  (ECF

21  Nos. 77; 80; 81; 84; 106; 107; 130).  The first time plaintiffs moved to compel, they filed a

22  "motion for sanctions against ATU International Defendants; motion to compel; for protective

23  order; and for an order directing counsel to cease obstructionist tactics during oral depositions."

24  (ECF No. 77).  Thus, plaintiffs' motion requested multiple forms of relief, and the clerk's office

25  indicated that "Counsel is advised to refile the **Motion to Compel** and the **Motion for**

26  **Protective Order** contained within ECF No. 77, each as separate entries, in accordance with the

27  Local Rules."  (ECF No. 78 (emphasis added)).

28

James C. Mahan
U.S. District Judge

1    Rather than file a motion to compel and a motion for protective order, plaintiffs filed

2   separate motions for sanctions (ECF No. 80) and to compel (ECF No. 81).  Thereafter, plaintiffs

3   filed only motions to compel.  (ECF Nos. 84; 106; 107; 130).  At issue here is plaintiffs'

4   "emergency motion to compel noticed 30(b)(6) witnesses [sic] testimony" (ECF No. 107), which

5   Judge Hoffman denied for failing to meet and confer (ECF No. 117).  Plaintiffs moved to compel

6   because the parties disagreed on, *inter alia*, whether the ATU defendants' 30(b)(6) witness was

7   noticed to testify "regarding compliance with the LMRDA" or "on ATU policies and

8   procedures." *Id.* at 9; (*see also* ECF No. 107).

9    After filing the instant motion to compel, plaintiffs also moved for clarification of the

10  clerk's notice instructing them of the local rules.  (ECF No. 114).  Plaintiffs articulated their

11  uncertainty as follows:

12        The three remedies sought, to compel resuming of the deposition,
         monetary sanctions for having to hold the resumed disposition, and
13       a protective order including admonishments for misconduct are all
         sanctions available for deposition misconduct.  However, it now
14       appears that though each of the requested relief in that case are
         considered available sanctions, the operation of Local Rule 2-2(b)
15       now supposedly requires the filing of three separate motions
         despite all the relief being requested are considered available
16       sanctions.  For this reason, Plaintiffs request the Court clarify if the
         operation of Local Rule 2-2(b) does, indeed, require the filing of
17       three separate Motions for deposition misconduct.

18  *Id.* at 7.

19   Judge Hoffman clarified that "[t]he Local Rule at issue requires the filer to file the same

20  document on the docket more than once, depending on the number of requests contained in the

21  document" and that "[e]ach time the document is filed, the filer must select a different type of

22  event." (ECF No. 117 at 11).  Judge Hoffman also provided an example: "if plaintiffs prepare a

23  motion to compel, and if within that motion is a request for sanctions, plaintiffs must file that

24  motion twice on the docket. Each filing must reflect a different event. The first filing event being

25  a 'motion to compel' and the second, a 'motion for sanctions.'" *Id.*

26   Thus, plaintiffs' understanding—that each requested *sanction* required a separate

27  motion—was clarified.  Instead, each *type* of relief—compel, sanctions, a protective order, etc.—

28  must be in a separate document.  Plaintiffs take umbrage with this explanation because, by their

James C. Mahan
U.S. District Judge                                     - 12 -

1   estimation, this creates a conflict between the local rules and Federal Rules of Civil Procedure.

2   (ECF No. 121).  Plaintiffs take Judge Hoffman's explanation to mean that Local Rule IC 2-2

3   "requir[es] that the motion be filed as a [m]otion to [c]ompel," which "imposes a meet and

4   confer certification requirement that is inconsistent with the Federal Rules of Civil Procedure."

5   *Id.* at 8.

6          The court disagrees.  First, plaintiffs correctly note that Local Rules are valid only if they

7   do not conflict with the federal rules.  *Id.* at 3 (citing Fed. R. Civ. P. 83; *Reese v. Herbert*, 527

8   F.3d 1253, 1266 n.20 (11th Cir. 2008)).  However, the Ninth Circuit is "under an obligation to

9   construe local rules" so they do not conflict with the federal rules.  *Marshall v. Gates*, 44 F.3d

10  722, 725 (9th Cir. 1995).  Indeed, "[t]he district court has considerable latitude in managing the

11  parties' motion practice and enforcing local rules that place parameters on briefing."  *Christian v.*

12  *Mattel, Inc.*, 286 F.3d 1118, 1129 (9th Cir. 2002).

13         Assuming *arguendo* that plaintiffs' interpretation of this court's local rules is correct such

14  that they must file a meet-and-confer certification along with any motion to compel redeposition,

15  this does not amount to a conflict with the Federal Rules of Civil Procedure.  The Central District

16  of California, addressing its analogous local rule, reasoned as follows:

17             Even if the Court were to adopt Plaintiff's interpretation of Rule
18             37(d), at most the Federal Rule is <u>silent</u> as to whether a party
               seeking sanctions based on the failure to appear at
19             a deposition must meet and confer. There is no express statement
               in the Rule affirmatively exempting a party from meeting and
20             conferring in such circumstances. Accordingly, the Central
               District's requirement -- under Local Rule 37-1 or Local Rule 7-3 -
21             - that parties must meet and confer prior to filing any motion (with
               certain exceptions not relevant here), does not <u>conflict</u> with Federal
22             Rule 37(d).

23  *DarbeeVision, Inc. v. C&A Mktg., Inc.*, No. CV 18-0725 AG (SSX), 2019 WL 2902697, *5

24  (C.D. Cal. Jan. 28, 2019) (emphasis in original).  The *DarbeeVision* court thus upheld the

25  requirement that parties "meet and confer pursuant to Local Rule 37-1 before filing a sanctions

26  motion under Federal Rule 37(d) based on the failure to appear at a deposition."  *Id.*

27         The *DarbeeVision* court's analysis is persuasive.  Conversely, plaintiffs' citation to

28  *Nelson v. Willden*, No. 2:13-CV-00050-GMN-VCF, 2014 WL 4471628, at *1 (D. Nev. Sept. 10,

James C. Mahan
U.S. District Judge

- 13 -

2014), is unavailing.  In *Nelson*, there was a direct conflict between the language of Rule 37(a)(d), which applies to "parties and all affected persons," and Local Rule 26-7(b), which applied only to "the parties."  2014 WL 4471628, at *1.

There is no such contradiction between the language of LR 26-7 and Rule 37(d). Although Rule 37(d) does not expressly require the parties to meet and confer, its silence on the issue does not prohibit district courts from implementing local rules that impose that requirement.  Therefore, there is no conflict between Local Rules 2-2(d), 26-7(b), and Federal Rule 37(d).

The court's interpretation is not as patently unreasonable as plaintiffs claim.  Plaintiffs' argument relies on the premise that they do not, and should not, need to meet and confer prior to a filing of a motion for sanctions, including "the sanction of redeposition."  To support this argument, plaintiffs cite *Brincko v. Rio Properties, Inc.*, 278 F.R.D. 576 (D. Nev. 2011), and *Cardinali v. Plusfour, Inc.*, No. 2:16-cv-02046-JAD-NJK, 2019 WL 1598746 (D. Nev. Apr. 15, 2019), neither of which are apposite.

In *Brincko*, the defendant moved to compel plaintiff's expert "to appear and answer questions at a second session of his deposition that he was instructed not to answer at his July 31, 2011, deposition."  *Brincko*, 278 F.R.D. at 578.  There, the defendant completed the deposition and then attempted to meet and confer with the opposing party:

> After the deposition concluded, counsel for [defendant] wrote to [opposing] counsel . . . requesting a telephonic meet-and-confer concerning the instructions not to answer, and inquiring whether the [opposing party] would agree to make [the expert witness] available for a continuation of his deposition at the [opposing party]'s expense.   Counsel engaged in extensive written communications and phone conversations, but the [opposing party] continues to refuse to make [the expert witness] available for a continuation of his deposition.

*Id.*

Next, in *Cardinali*, Magistrate Judge Koppe found "that attorney and deponent misconduct is rife in the transcript, and [after] review[ing] that transcript, [Judge Dorsey] agree[d]."  *Cardinali*, 2019 WL 1598746, at *2.  However, regarding the "sanction of redeposition" in that case, Judge Dorsey indicated that "ordering the [plaintiff's law firm] to

1    reappear for deposition wasn't a sanction—it was an order directing the Firm to comply with

2    [defendant's] Rule 45 subpoena." *Id.* at \*1.  Notably, the defendant in *Cardinali* filed separate

3    motions for sanctions and to compel; it also included a meet-and-confer certification and

4    declaration along with its motion to compel.  *See Cardinali v. Plusfour, Inc.*, No. 2:16-cv-02046-

5    JAD-NJK, ECF Nos. 129; 130; 131 at 9.

6        Here, plaintiffs did not request to meet and confer, unlike the defendants in *Brincko* and

7    *Cardinali*.  Nor did they attempt to reschedule a follow-up deposition on the disputed topics, like

8    the *Brincko* defendant did.  The defendant in *Cardinali* abided by the exact procedure that

9    plaintiffs claim is irreconcilable with the Federal Rules of Civil Procedure.  Rather than abide by

10   that procedure, plaintiffs summarily contend that a brief tête-à-tête during the deposition, which

11   did not touch upon the majority of the problems articulated in their motion (*see* ECF No. 107),

12   satisfies the meet and confer requirement.

13       Consequently, the court finds that Judge Hoffman's order was not clearly erroneous or

14   contrary to law.  The court denies plaintiffs' objection.  (ECF No. 121).

15       *b.  Reconsider*

16           *i.  Procedural background*

17       The court finds that further procedural explanation is necessary before delving directly

18   into the instant motion for reconsideration.  In *Mendoza I*, Mendoza brought state-law claims that

19   were preempted by the Labor Management Relations Act ("LMRA").  (*See Mendoza I*, ECF No.

20   30 at 7).  The ATU defendants[11] moved to dismiss the claims against them.  (*Mendoza I*, ECF

21   No. 38).  The court granted that motion in part and dismissed all but Mendoza's first and second

22   claims.  (*Mendoza I*, ECF No. 82).

23       In opposition to the ATU defendants' motion to dismiss, Mendoza argued that the Labor-

24   Management Reporting and Disclosure Act's ("LMRDA") "presumption of validity" should not

25   apply to his claims.  (*Mendoza I*, ECF No. 44 at 6–9).  In virtually the same breath, Mendoza

26   also argued that his state-law claims against individual ATU defendants "should not be

27   _____

28       [11]  The ATU defendants in *Mendoza I* include all of the current ATU defendants except
     ATU International Vice President Richie Murphy.

James C. Mahan
U.S. District Judge

dismissed because [he would] simply amend the complaint alleging the same claims under the LMRDA and state law." *Id.* at 29–30 (capitalization removed).  The court held that "[Mendoza] [could not] have it both ways" and declined his invitation to "apply a theory of liability under the LMRDA . . . while simultaneously refusing to apply the 'presumption of validity' standard set forth by the LMRDA to plaintiff's claims regarding the imposition of the trusteeship." (*Mendoza I*, ECF No. 82 at 9).

Notably, the court denied Mendoza's motion to stay the deadline to amend pleadings on March 23, 2018, while the ATU defendants' motion to dismiss was pending.  (*See* ECF Nos. 53; 58).  Plaintiff requested the deadline be stayed because:

> There is currently pending before this Court a Motion to Dismiss that, due to this Court's prior ruling on Plaintiff's Motion to Remand, will result in the dismissal of at least some of Plaintiff's causes of action. Plaintiff was waiting on the Court to issue its ruling on the Motion to Dismiss in order to amend his Complaint to add claims that will likely be dismissed under the LMRA, that also fall under the LMRDA numerous provisions addressing breaches of union constitutions. However, Plaintiff cannot amend his Complaint effectively without first knowing which of Plaintiff's state law claims this Court is going to find are preempted by the LMRA. As such, Plaintiff requests that this Court stay the deadline to amend pleadings until after this Court resolves the Motion to Dismiss.

(*Mendoza I,* ECF No. 53 at 2).

When declining Mendoza's motion, the court specifically noted that Mendoza "was made aware of the deadline to amend the pleadings on November 11, 2017, when the [c]ourt issued its scheduling order," and that he "therefore knew of both the deadline to amend pleadings and the likelihood that he would need to do so well in advance of the deadlines." (*Mendoza I*, ECF No. 58 at 5).  Further, Judge Hoffman reasoned that Mendoza "cite[d] no authority in support of his argument that he is unable to amend the pleadings until the [c]ourt issues its order on the motion to dismiss, and the [c]ourt is unpersuaded." *Id.*  Two months later, on May 25, 2018, plaintiffs filed *Mendoza II*.  (ECF No. 1).

Although the deadline to amend the pleadings had passed by the time the court granted the ATU defendants' motion, the court dismissed Mendoza's claims without prejudice and expressly allowed him to file a motion for leave to amend. (*Mendoza I*, ECF No. 82 at 9 n.4

James C. Mahan
U.S. District Judge

("Because the court recognizes that the plaintiff is the master of the complaint, the court will dismiss plaintiff's claims without prejudice so that plaintiff may file a motion for leave to amend.")).

In *Mendoza II*, the ATU defendants moved to dismiss all of the *Mendoza II* claims against them on the basis of this circuit's prohibition against "claim splitting" (ECF No. 33), which the court granted (ECF No. 142). In the initial motion briefing, the ATU defendants argued as follows:

> A plaintiff generally has "no right to maintain two separate actions involving the same subject matter at the same time in the same court and against the same defendant." *Adams v. Calif. Dep't of Health Servs.*, 487 F.3d 684, 688 (9th Cir. 2007) (citation omitted). By the same token, "the fact that [a] plaintiff was denied leave to amend does not give [him] the right to file a second lawsuit based on the same facts." *Id.* (quoting *Hartel Springs Ranch of Colo. v. Bluegreen Corp.*, 296 F.3d 982, 989 (10th Cir. 2002)). Where a plaintiff seeks to circumvent this principle, district courts may dismiss the second complaint with prejudice. *Fairway Rest. Equip. Contracting, Inc. v. Makino*, 148 F. Supp. 3d 1126, 1128 (D. Nev. 2015) (Mahan, J.).

(ECF No. 33 at 6).[12]

Plaintiffs responded by claiming this argument was "fundamentally flawed" and "meritless" because they could not have been trying to circumvent the court's order after "the [c]ourt recently rescinded its prior [o]rder on the issue of adding the LMRDA claims in *Mendoza I*." (ECF No. 43 at 5). But this argument does not address the fact that plaintiffs filed *Mendoza II* just two months after the court declined to extend the deadline to amend his pleadings in *Mendoza I*. Mendoza represented that he would amend his *Mendoza I* complaint. The court gave him an opportunity to do so. Mendoza never did.

> ii.   *Claim splitting*

The court now turns to the instant motion for reconsideration. The claim splitting doctrine bars a party from subsequent, duplicative litigation where the "same controversy" exists.

---

[12] The ATU defendants' buttressed this argument by showing Mendoza's intent to bring these claims in *Mendoza I*: "In a[n] . . . appeal to the Ninth Circuit, Mendoza criticized this [c]ourt's decision . . . and acknowledged that he and 'the other ousted Local 1637 Executive Board officers must now file a Second Complaint under the LMRDA . . . .'" (ECF No. 33 at 7); (*see also* ECF No. 33-3 at 25)).

1    *See, e.g., Single Chip Sys. Corp. v. Intermec IP Corp.*, 495 F.Supp.2d 1052, 1057 (S.D. Cal.

2    2007) (quoting *Nakash v. Superior Court*, 196 Cal.App.3d 59 (Cal. Ct. App. 1987)). To

3    determine whether a suit is duplicative, courts in the Ninth Circuit borrow from the test for claim

4    preclusion. *Adams v. Cal. Dep't of Health Servs.,* 487 F.3d 684, 689 (9th Cir. 2007), *overruled*

5    *on other grounds by Taylor v. Sturgell*, 553 U.S. 880, 904 (2008).

6         A district court may exercise its discretion to dismiss a duplicative later-filed action, to

7    stay that action pending resolution of the previously filed action, to enjoin the parties from

8    proceeding with it, or to consolidate both actions. *See Adams*, 487 F.3d at 688; *Curtis v.*

9    *Citibank, N.A.*, 226 F.3d 133, 138–39 (2d Cir. 2000); *Russ v. Standard Ins. Co.*, 120 F.3d 988,

10    990 (9th Cir. 1997).  In determining whether a later-filed action is duplicative, a court must

11    examine "whether the causes of action and relief sought, as well as the parties or privies to the

12    action, are the same." *Adams*, 487 F.3d at 688.

13             *1.  Propriety of claim splitting dismissals in a consolidated action*

14         As an initial matter, plaintiffs argue that the court's options when faced with duplicative

15    litigation—dismiss, stay, enjoin, or consolidate—are mutually exclusive.  (ECF No. 152 at 19–

16    25).  Plaintiffs rely principally on the out-of-circuit case *Bay State HMO Mgmt., Inc. v. Tingley*

17    *Sys., Inc.*, 181 F.3d 174 (1st Cir. 1999).  Plaintiffs contend that the *Bay State* holding stands for

18    the proposition that this court could not both consolidate this action and dismiss the *Mendoza II*

19    claims against the ATU defendants on the basis of claim splitting because both actions are now

20    considered a single case.

21         The court disagrees.  First, *Bay State* is not binding on this court.  Second, even if it were,

22    the *Bay State* court held that applying *res judicata* to the second action in a consolidated case

23    was reversible error because dismissal of the first action did not constitute a "final judgment."

24    *Bay State HMO Mgmt., Inc.*, 181 F.3d at 177 ("Because we find that the first element [a final

25    judgment on the merits in an earlier action] is not satisfied, we do not address Tingley's other

26    contentions.").  The First Circuit explained that "[t]here was no final judgment on the merits in

27    an earlier action; there was only a final judgment on a portion of the aggregate case.  Therefore,

28    the application of res judicata in this case was inappropriate." *Id.* at 182.  Even then, the *Bay*

**James C. Mahan**
**U.S. District Judge**

1    *State* court was careful to note that actions retain their separateness despite consolidation and

2    rejected the notion "that consolidated actions must always be treated as separate actions *for all*

3    *purposes.*"  *Id.* at 178 (emphasis in original).

4         Although claim splitting is a facet of *res judicata*, it is not identical.  Importantly, claim

5    splitting, unlike *res judicata*, does not require a final judgment on the merits in the prior case.

6    *Single Chip Sys. Corp.*, 495 F.Supp.2d at 1058.  Thus, the *Bay State* holding is not dispositive in

7    the claim-splitting context.

8         The court finds that claim splitting is still available, the consolidation of *Mendoza I* and

9    *Mendoza II* notwithstanding.  While **dismissal** of either *Mendoza I* or *Mendoza II* would not

10   result in a "final judgment" for the purposes of *res judicata*, claim splitting is concerned with the

11   **filing** of *Mendoza II* as a duplicative action.  Thus, the court still has discretion to dismiss the

12   *Mendoza II* claims against the ATU defendants if warranted.

13                    *2.  Claim splitting analysis*

14        Plaintiffs claim that the interaction between their state-law claims, the LMRA, and the

15   LMRDA means that certain legal theories and remedies were "unavailable" in *Mendoza I* such

16   that their claims against the ATU defendants are not subject to the prohibition against claim

17   splitting.  (ECF No. 152 at 11–19).

18        The court disagrees.  Put plainly, this court finds that Mendoza is once again trying to

19   have his cake and eat it, too.  Mendoza pleaded *Mendoza I* under state law in state court, where

20   he wanted the case to remain.  The case was properly removed based on preemption under

21   § 301(a) of the LMRA.  Mendoza wanted to maintain his claims against individuals under the

22   LMRA, despite the statutory prohibition thereon.

23        But Mendoza did not want to plead LMRDA claims in *Mendoza I* because, as he now

24   argues in support of his motion for reconsideration, "if he had chosen to amend the *Mendoza I*

25   [c]omplaint, by clearly indicating that doing so would cause [p]laintiff Mendoza's LMRA claims

26   to be governed by the legal theories that govern the LMRDA."  (ECF No. 152 at 12).  By

27   plaintiffs' estimation, this means that they "would have forfeited th[e] entire ['straight breach of

28   contract' LMRA] legal theory in *Mendoza I* forcing the entire action to be governed by the

**James C. Mahan**
**U.S. District Judge**

1    LMRDA, and the ATU International Defendants would have succeeded on summary judgment

2    in regards to the LMRA trusteeship claim." *Id.* at 13.  In response, the ATU defendants urge that

3    Mendoza's "strategic decision to plead breach-of-contract claims rather than LMRDA claims in

4    *Mendoza I* was not a legal barrier to their recovery"; instead, Mendoza "w[as] faced with 'two

5    choices' and elected to forgo certain avenues of relief in order to, in [his] view, increase [his]

6    chances of winning." (ECF No. 159 at 7).

7        Whether one of Mendoza's claims was meritorious or would ultimately be successful in

8    light of his other claims—and the legal framework governing his case—is not dispositive of

9    claim splitting's applicability.  To the contrary, "[t]he 'same transactional nucleus of facts' factor

10   is commonly held to be outcome determinative."  (ECF No. 142 at 13 (citing *Mpoyo v. Litton*

11   *Electro-Optical Sys.*, 430 F.3d 985, 988 (9th Cir. 2005)).  Although that factor is often

12   dispositive virtually on its own, the court also considers "(1) whether rights or interests

13   established in the prior judgment would be destroyed or impaired by prosecution of the second

14   action; (2) whether substantially the same evidence is presented in the two actions; [and] (3)

15   whether the two suits involve infringement of the same right . . . ."  *Costantini v. Trans World*

16   *Airlines*, 681 F.2d 1199, 1202 (9th Cir. 1982).

17       Importantly, plaintiffs do not dispute or otherwise ask the court to reconsider its

18   determination that "the transaction test factors weigh in favor of finding that *Mendoza I* and

19   *Mendoza II* are the same causes of action with the same relief sought."  (ECF No. 142 at 13);

20   (*see generally* ECF No. 152).  Instead, plaintiffs now argue only the second prong of the claim-

21   splitting analysis: whether the parties or privies to the action are the same.  *Id.*

22       Supreme Court precedent establishes six exceptions to the general rule "that one is not

23   bound by a judgment *in personam* in a litigation in which he is not designated as a party or to

24   which he has not been made a party by service of process."  *Taylor*, 553 U.S. at 884 (quoting

25   *Hansberry v. Lee*, 311 U.S. 32, 40 (1940)) (quotation marks omitted).  As relevant here, a

26   nonparty's suit is precluded when the nonparty was "adequately represented by someone with

27   the same interests who was a party."  *Id.* at 894 (quoting *Richards v. Jefferson Cty., Ala.*, 517

28

James C. Mahan
U.S. District Judge

U.S. 793 (1996)) (quotation marks and alteration omitted).   Regarding the adequate representation exception, the *Taylor* court explained as follows:

> A party's representation of a nonparty is "adequate" for preclusion purposes only if, at a minimum: (1) The interests of the nonparty and her representative are aligned, and (2) either the party understood herself to be acting in a representative capacity or the original court took care to protect the interests of the nonparty.

*Id.* at 900.[13]

Similarly, "a party bound by a judgment may not avoid its preclusive force by relitigating through a proxy," such that a nonparty's suit is precluded when it "later brings suit as the designated representative of a person who was a party to the prior adjudication."   *Id.* at 895 (citing *Chicago, R.I. & P.Ry. Co. v. Schendel*, 270 U.S. 611, 620 (1926); 18A Wright & Miller § 4454, at 433–434).

Plaintiffs contend that "[t]he adequate representation exception that this [c]ourt has applied does not apply because this case is not one of the enumerate [sic] representative actions the United States Supreme Court has found the exception can applicable [sic]."   (ECF No. 152 at 9).   In particular, plaintiffs contend that "[t]he only claim that could possibly be considered as being brought in a representative capacity in . . . *Mendoza I* and *Mendoza II* are the trusteeship claims, which . . . must always be brought on behalf on the local union and its membership as a whole."   *Id.* at 10.

Plaintiffs believe that "[w]hat appears to be occurring here is that this [c]ourt is dismissing the *Mendoza II* [p]laintiffs' LMRDA, RICO, and state law defamation claims because they retained the same attorney, not because they involve the same parties and claims."   (ECF No. 152 at 18).   Not so.   What is, in fact, happening here is that the court is dismissing plaintiffs' *Mendoza II* claims because they were adequately represented by Mendoza in *Mendoza I*.   To the

---

[13]   The Court also noted that "adequate representation sometimes requires (3) notice of the original suit to the persons alleged to have been represented," *Taylor*, 533 U.S. at 900, but the plaintiffs here do not dispute that they received notice of *Mendoza I*, (*see generally* ECF Nos. 43; 142; 164).   Nor can they argue they did not receive notice of *Mendoza I* because, as the court previously noted, plaintiffs "all attached declarations supporting Mendoza's motion for partial summary judgment."   (ECF No. 142 at 15 (citing *Mendoza I*, ECF No. 68)).

James C. Mahan
U.S. District Judge

- 21 -

extent they were not adequately represented, plaintiffs are nothing but proxies for Mendoza, who wants as many bites at the apple as he can get.

Plaintiffs in this action consistently blurred the lines between *Mendoza I* and *Mendoza II* prior to the court consolidating the actions on March 27, 2019.  For instance, plaintiffs moved in this action for a temporary restraining order that relied on discovery material that Mendoza received in *Mendoza I*.  (ECF No. 4).  Further, as the ATU defendants point out, the *Mendoza II* plaintiffs amended their complaint, adding 13 new causes of action and four new defendants, the day after briefing on the summary judgment motions in *Mendoza I* was completed.  (ECF No. 33 at 4); (*see also* ECF No. 8; *Mendoza I*, ECF No. 68).  In fact, "[m]any of the Amended Complaint's allegations are taken verbatim from one of Mendoza's motions for summary judgment in *Mendoza I*."  (ECF No. 33 at 4); (*Compare* ECF No. 8, *with Mendoza I*, ECF No. 68).

Moreover, plaintiffs' prolix complaint in *Mendoza II* further evinces that plaintiffs were adequately represented by and are proxies for Mendoza.  For the first 30 pages, the complaint simply reiterates the controversy underlying *Mendoza I*.  (ECF No. 8 at 1–30).  Plaintiffs' first allegation of harm to anyone but Mendoza is on page 31 as follows:

> 143. The Plaintiffs, Plaintiff Mendoza excluded, have been permitted to run for the May 30, 2018 election, and many of them were nominated for their former positions on the Local 1637 Executive Board.

> 144. Defendant Lindsay permitted those opposing Plaintiffs in this action who ran for this election to run a campaign promising prosecution of Plaintiffs for embezzlement of union money without informing the membership that none of them were officially charged or found guilty of stealing money from Local 1637.

*Id.* at 31.

The complaint then continues to allege harm that is entirely duplicative of *Mendoza I*.  For instance, plaintiffs' eighth cause of action is illustrative of the redundancy between these actions: "receiving and accepting something of value from a union employer in violation of LMRA 29 U.S.C. § 186," brought against the ATU and KTA defendants.  *Id.* at 66–69.

Although claim 8 does not specify which plaintiffs bring the claim and refers to "plaintiffs," the only harm alleged in that claim pertains to Mendoza. *See, e.g., id.* at 68 ("As a direct and proximate result of Defendants' actions . . . **Plaintiff Mendoza has been harmed** . . . individually and as members [sic] of Local 1637, **which Plaintiff Mendoza would have received** if Defendants had never removed Plaintiffs from office and imposed this trusteeship." (emphasis added)).  Claim 18 likewise relates only to Mendoza. *Id.* at 84–86.  Plaintiffs assert "[t]hat [the ATU d]efendants initiated a criminal investigation against [p]laintiffs with Department of Labor," *id.* at 84, but the Department of Labor ("DOL") Office of Labor-Management Standards ("OLMS") investigation was against only Mendoza, (*see* ECF No. 140-4 at 7).

Thus, the court finds that plaintiffs were adequately represented by Mendoza in *Mendoza I*.  Plaintiffs urge that certain *Mendoza II* claims could not have been brought by Mendoza in the first action to no avail.  Those claims, as they have been brought in the second action, amount to little more than a recitation the prior claims that Mendoza indicated he would "forfeit" if he also brought LMRDA claims.

Accordingly, the court denies plaintiffs' motion to reconsider.  (ECF No. 152).  Because the court denies plaintiffs' motion to reconsider, the court denies the ATU defendants' motion for summary judgment regarding *Mendoza II* (ECF No. 136) as moot.

    *c.   Summary judgment*

        *i.   Summary judgment as to the remaining claims against the KTA defendants*

In its prior order, the court noted that three claims could proceed against the KTA defendants: the tenth, thirteenth, and nineteenth causes of action for RICO, defamation, and civil conspiracy, respectively.  (ECF No. 142 at 19).  The court will address the defamation claim and then turn to the RICO and civil conspiracy claims.

        *1.   Claim 13: Defamation*

Neither party argued the thirteenth or nineteenth causes of action in the initial briefing for the KTA defendants' motion for summary judgment.  (ECF Nos. 137; 149).  After the court's order, KTA indicated in its reply that "it appears [p]laintiffs never intended their defamation

claim to apply to KTA [d]efendants" and that the claim should be dismissed as against them because "the [t]hirteenth [c]ount contains no specific allegation of any defamation of any kind purportedly perpetrated by the KTA [d]efendants." (ECF No. 156 at 2, 20).  The court finds that plaintiffs' defamation claim against KTA—if plaintiffs intended to plead such a claim in the first place—fails for the same reasons articulate in the court's prior order regarding the MKA defendants.  (ECF No. 142 at 8–9).

Accordingly, the court dismisses the thirteenth cause of action against the KTA defendants.  Thus, the court is left to determine whether summary judgment is appropriate regarding plaintiffs' RICO and civil conspiracy claims.

### 2.  Claim 10: RICO

The RICO Act "provides a private right of action for treble damages to '[a]ny person injured in his business or property by reason of a violation" of the Act's criminal prohibitions." *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 641 (2008) (quoting 18 U.S.C. § 1964(c)).  Thus, to plead a civil RICO claim, plaintiff must demonstrate: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (known as 'predicate acts') (5) causing injury to plaintiff's 'business or property.'"  *Living Designs, Inc. v. E.I. Dupont de Nemours & Co.*, 431 F.3d 353, 361 (9th Cir. 2005) (quoting *Grimmett v. Brown*, 75 F.3d 506, 510 (9th Cir. 1996)).

Further, because RICO claims involve underlying fraudulent acts, Federal Rule of Civil Procedure 9(b)'s heightened pleading standard applies.  *Edwards v. Marin Park, Inc.*, 356 F.3d 1058, 1065–66 (9th Cir. 2004); *see also* Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.").  Thus, to sufficiently plead its RICO claim, a plaintiff must specify the time, place, and content of the alleged underlying fraudulent acts and statements, as well as the parties involved and their individual participation.  *Edwards*, 356 F.3d at 1066.

A plaintiff proves the existence of an "enterprise" by providing "evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit."  *United States v. Turkette*, 452 U.S. 576, 583 (1981).  The United States

James C. Mahan
U.S. District Judge

Supreme Court was careful to clarify that "[t]he 'enterprise' is not the 'pattern of racketeering activity'; it is an entity separate and apart from the pattern of activity in which it engages." *Id.*

Further, the Ninth Circuit has clarified what constitutes a "continuing unit" for the purposes of being a RICO "enterprise." *See Odom v. Microsoft Corp.*, 486 F.3d 541, 553 (9th Cir. 2007). In *Odom*, the Ninth Circuit explained that the "continuity requirement focuses on whether the associates' behavior was 'ongoing' rather than isolated activity." *Id.*

Taken together with the "pattern of racketeering" element, plaintiffs must "show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *Sever v. Alaska Pulp Corp.*, 978 F.2d 1529, 1535 (9th Cir. 1992) (emphasis in original) (quoting *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989)). Thus, a defendant that engages in "a single episode with a single purpose which happened to involve more than one act taken to achieve that purpose" is not liable for RICO. *Sever*, 978 F.2d at 1535.

Here, plaintiffs' RICO claim against the KTA defendants fails because plaintiff does not show either an enterprise or an ongoing pattern of racketeering. Plaintiffs' RICO theory is premised on the insinuation that the KTA defendants and ATU defendants conspired together. (ECF No. 149 at 5–13). By plaintiffs' estimation, Keolis terminated Mendoza's employment so that ATU could use such termination as an affirmative defense to suit[14] and, in return, ATU made concessions to the Keolis when negotiating their 2017 collective bargaining agreement ("CBA"). *Id.* at 12–13.

The court finds that this singular "transaction"—although it may have involved a series of distinct actions in furtherance thereof—does not show the existence of an ongoing enterprise or a pattern of racketeering activity. Instead, this evidence is more appropriately discussed in the context of a civil conspiracy claim.[15] Thus, summary judgment in favor of the KTA defendants is appropriate as to this claim.

---

[14] Plaintiffs also contend that Keolis terminating Mendoza allowed it to "maintain control over Local 1637," but this argument does not hold water in light of plaintiffs' concession that "KTA [d]efendants have no ability to impact proceedings dealing with the ATU constitution." (ECF No. 149 at 20).

[15] The court notes the lack of specificity regarding plaintiffs' civil conspiracy claim. While plaintiffs' complaint does not elaborate on which defendants conspired together for what

James C. Mahan
U.S. District Judge

- 25 -

1

### 3.   Claim 19: Civil conspiracy

2      "In Nevada, an actionable civil conspiracy is defined as 'a combination of two or more

3  persons, who by some concerted action, intend to accomplish some unlawful objective for the

4  purpose of harming another which results in damage.'" *Flowers v. Carville*, 266 F. Supp. 2d

5  1245, 1249 (D. Nev. 2003) (quoting *Collins v. Union Fed. Sav. & Loan Ass'n,* 662 P.2d 610, 622

6  (Nev. 1983)).

7      The court considers "whether the evidence presents a sufficient disagreement to require

8  submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."

9  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).   To survive a motion for

10  summary judgment, plaintiffs "must do more than simply show that there is some metaphysical

11  doubt as to the material facts." *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 783 (9th Cir. 2002)

12  (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348,

13  89 L.Ed.2d 538 (1986)).  Thus, "[t]he mere existence of a scintilla of evidence in support of the

14  plaintiff's position will be insufficient; there must be evidence on which the jury could

15  reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

16      As discussed above, plaintiffs contend that Keolis terminated Mendoza as part of a *quid*

17  *pro quo* with ATU.  (*See generally* ECF No. 149).  Plaintiffs argue that the ATU and KTA

18  defendants' agreement also caused irregularities in the grievance and settlement process when

19  Mendoza disputed his termination.  *Id.* at 7–12.  These irregularities include rescheduling the

20  "step 1 meeting" for Lindsay but not Mendoza, Keolis making a settlement offer after only one

21  hour, and Lindsay accepting the settlement offer on Mendoza's behalf.  *Id.*

22      Regarding the supposed concessions during CBA negotiations, the KTA defendants

23  argue that, "[r]eviewing [KTA's representative, Michael] James' extensive charge of negotiation

24  items clearly shows that both side compromised on multiple elements of the CBA, with the union

25  gaining certain pay increases, contributions to pension benefits and terms of leave." (ECF No.

26  156 at 15 (citing ECF No. 149-22)).   As it pertains to Mendoza's termination, the KTA

27

28  unlawful purpose, this termination-for-concessions conspiracy arguably falls within plaintiffs'
allegation that "[d]efendants, acting in concert, intended to accomplish an unlawful objective for
the purpose of harming [p]laintiffs the aforementioned unlawful objectives [sic]." (ECF No. 8 at
86).

**James C. Mahan**
**U.S. District Judge**

defendants note that "Mendoza testified during his deposition that he had no desire or intention to return to driving." *Id.* at 12 (emphasis in original).  Finally, the KTA defendants aver that firing Mendoza to supposedly give ATU an affirmative defense to suit is belied by the fact that "Mendoza filed the *Mendoza I* lawsuit on Sept. 21, 2017, more than one year after KTA [d]efendants notified him of his job abandonment.  Given the timing, [p]laintiffs' creative theory is utterly implausible." *Id.* at 14 (emphasis in original).

Mendoza does not dispute that "Section 21.6 of the Keolis CBA requires an employee convicted of DUI to report such conviction by the next work day." (ECF No. 149 at 6 (citing ECF No. 138 at 3)).  Mendoza never informed Keolis of his DUI, never told Keolis that his CDL had been revoked, and never attempted to recertify his CDL.  Then, when Keolis attempted to contact him regarding his return-to-work date and his CDL, Mendoza refused to talk to Keolis.

Any irregularities Mendoza complains of do not raise anything more than some metaphysical doubt as to the material facts.  As this court noted in *Mendoza I*,[16] Mendoza voluntarily chose not to return to work at Keolis.  In fact, Mendoza was adamant that he did not intend to return to work for Keolis; instead, Mendoza insisted on being granted a personal leave of absence to continue disputing the trusteeship over Local 1637.  (ECF No. 156 at 13). Consequently, the KTA defendants had every right to terminate an employee who (1) was not qualified to perform the job and (2) refused to work.

A handful of concessions in a collective bargaining agreement negotiation—even taken together with the supposed irregularities in the grievance process—is not enough to genuinely create an issue of whether that termination was part of a *quid pro quo*.  Mendoza was fired only after the trusteeship had been approved, well before Mendoza filed his first lawsuit, and with good cause.  There is simply not enough evidence for any reasonable juror to find that a conspiracy existed between the KTA and ATU defendants.

---

[16] *See Mendoza, Jr. v. Amalgamated Transit Union International, et al.*, case no. 2:17-cv-2485-JCM-CWH, at ECF No. 62.

1    Accordingly, the court grants KTA's motion for summary judgment as to the remaining

2    civil conspiracy claim.  The court has now dismissed all claims against the KTA defendants, who

3    are dismissed from this action entirely.

4        *ii.   Summary judgment as to the remaining claims against the ATU defendants*

5    Only two breach of contract claims remain against the ATU defendants, both of which

6    stem from purported violations of ATU's CGLs.  The first claim is predicated on the ATU

7    defendants' surreptitiously amending article 4 of Local 1637's bylaws—which deals with officer

8    compensation—and subsequently failing to follow the proper procedure when charging Mendoza

9    with malfeasance.  The second claim stems from the fraudulent contravention of the ATU

10   International CGLs when implementing the trusteeship.

11   The court will address each of Mendoza's claims in turn.  However, the court once again

12   notes that both claims are predicated on the ATU defendants' alleged violation of the ATU

13   CGLs and, as a result, are within the scope of LMRA § 301.[17]  *See Wooddell v. Int'l Bhd. Of*

14   *Elec. Workers, Local 71*, 502 U.S. 93, 101–02 (1991).  Thus, when adjudicating these claims, the

15   "review of a union's interpretation of its own governing documents and regulations is highly

16   deferential, absent bad faith or special circumstances."  *Bldg. Material & Dump Truck Drivers,*

17   *Local 420 v. Traweek*, 867 F.2d 500, 511 (9th Cir. 1989) (citations omitted).

18        *1.   Claim 1*

19            *a.   Surreptitious amendment of the bylaws*

20   Plaintiff Mendoza alleges that the accusation that he overpaid his salary was

21   "intentionally fraudulent."  (ECF No. 147 at 14).  In particular, Mendoza argues as follows:

22            [T]here were multiple conflicting versions of the Local 1637
             Bylaws in the possession of both ATU International and Local
23            1637, some of which gave the PBA the highest rate of pay of any
             employee in the union, some that gave the PBA the highest pay in
24            their respective job classification, some which granted the PBA the
             same rate received under their CBA, and all of which were not
25            sufficiently clear to make a determination that Appellant was
             overpaid.
26

27   _____

28       [17] And, to the extent that Mendoza brings a state law tort claim, those claims are
     preempted by § 301.  *See AllisChalmers Corp. v. Lueck*, 471 U.S. 202, 220 (1985).

James C. Mahan
U.S. District Judge                                                - 28 -

1    *Id.*[18]

2        This argument is unavailing.  The evidence clearly shows that Mendoza requested Local

3    1637's operative bylaws on Tuesday, March 5, 2013.  (ECF No. 135-26 at 72).  Kristi Adams,

4    assistant to the international executive vice president, sent Mendoza the Local 1637 bylaws as

5    approved in February 2012.  *Id.* at 72–78.  Mendoza forwarded the same set of bylaws along to

6    Hanley and ATU, indicating that they were Local 1637's "current local bylaws" and that they

7    "are the bylaws that our local has on file and we go by."  *Id.* at 79.  The bylaws Mendoza

8    forwarded and affirmed as operative are the same as the bylaws Raske emailed to ATU in 2012.

9    (*Compare* ECF No. 135-26 at 79–85, *with* ECF No. 135-29).

10       Each and every iteration of these bylaws—from Adams to Mendoza, from Mendoza to

11   Hanley, and from Raske to Tracy Oliver on behalf of ATU—includes the provision that the

12   president "shall be paid at a daily rate of 8 hours times the highest hourly rate paid to an

13   employee in their respective job classification for 40 hours per week to perform the duties of the

14   office."  (ECF Nos. 135-26 at 73, 80; 135-29 at 3).  Indeed, Mendoza quoted this same provision,

15   including the word "respective," to justify his salary at the mechanic rate when discussing it with

16   defendant Hanley in August 2016.  (ECF No. 135-7 at 3–4).

17       Accordingly, Mendoza was aware of the bylaws as they were adopted by Local 1637 in

18   2012.  Mendoza acknowledged that the 2012 bylaws were operative on several occasions.  He

19   disputes their authenticity and points to the existence of a variety of other versions only now that

20   he has filed suit.  This argument is a nonstarter, and summary judgment is appropriate—

21   particularly because, regardless of which version of the bylaws were operative, Mendoza was

22   entitled only to the operator rate.[19]

23   ───────────────

24   [18] Notably, Mendoza does not argue that the ATU defendants unilaterally amended the
     bylaws in his response.  (ECF No. 147 at 14).  Instead, Mendoza now argues that Hanley
25   "brought the false charge of overpayment of appellant's [sic] salary based on **inapplicable
     versions** of the Local 1637 bylaws he unilateral [sic] **interpreted** without consulting the ATU
26   GEB."  *Id.* (capitalization omitted and emphasis added).

27   [19] As the court recounted above, Local 1637's 2008 bylaws provided that the president
     would "be paid at a daily rate of 8 hours times the highest hourly rate paid to an employee in
28   their job classification for 40 hours per week to perform the duties of the office."  (ECF No. 135
     at 4).  Local 1637 rejected an amendment that would remove the reference to "their job
     classification," which would have allowed presidents to be paid the highest mechanic rate, in

James C. Mahan
U.S. District Judge

1    Therefore, the court grants the ATU defendants' motion as to the alleged amendment of

2    Local 1637's bylaws.

3                    *b.   Improper procedure for disciplinary action*

4    Section 12.5 of the ATU constitution provides that "[t]he GEB's power to deal with

5    members found guilty of violations of this section shall include the power to suspend, expel, fine,

6    declare ineligible for holding office or otherwise discipline such members." (ECF No. 135-2 at

7    9). ATU CGLs also allow the GEB to discipline a member only after he or she is afforded a

8    hearing. *Id.*

9    Plaintiff Mendoza argues that "ATU IP Hanley . . . exercised the GEB's exclusive power

10   to discipline local union officers by imposing a disciplinary fine, directing Mendoza to repay

11   Local 1637 $5,865.60." (ECF No. 147 at 10). Mendoza contends he was wrongfully "fined"

12   because "ATU IP Hanley never served Mendoza with formal charges, Mendoza was not given

13   time to defend the charges, and he was never accorded a fair hearing in violation of 29 U.S.C.

14   411(a)(5)." *Id.* Further, Mendoza urges that the ATU defendants "violated the ATU CGL Sec.

15   12.6 by failing to formally charge [p]laintiffs [the Local 1637 executive officers], and failing to

16   hold a hearing on those charges as required by the trusteeship section" before instituting a

17   trusteeship. *Id.*

18                            *i.   Repayment*

19   To the first point, the ATU defendants argue that "a directive that a local union officer

20   repay money that he was not authorized to receive in the first place does not constitute a 'fine'

21   under [s]ection 12.5 of the Constitution." (ECF No. 135 at 19). Instead, Hanley and ATU

22   Assistant General Counsel Daniel Smith both characterize the repayment request as "an

23   instruction to repay a debt that [p]laintiff owed to the Local." *Id.* The ATU defendants argue

24   that this interpretation is "plainly reasonable" and supported by case law, namely *Mack v.*

25   *Transp. Workers Union of Am.*, No. 00 CIV. 9231 (JSR), 2002 WL 500377 (S.D.N.Y. Mar. 29,

26   2002), and *In re Scheer*, 819 F.3d 1206 (9th Cir. 2016).

27   ───────────────────────────────

28   2011, and, in 2012, added the word "respective" before "job classification." *Id.* at 4–5. Thus,
     every operative version of the bylaws prohibited Mendoza, an operator, from paying himself the
     mechanic rate.

**James C. Mahan**
**U.S. District Judge**

1       In *Mack*, a union officer was disciplined for the wrongful use of her union credit card.

2   *See generally Mack*, 2002 WL 500377.   After a disciplinary hearing, the union ordered the

3   officer to repay the union for the improper credit-card charges.  *Id.* at *2.   The officer sued the

4   union and "argue[d] that the order requiring her to repay the union for the improper credit-card

5   charges is tantamount to a fine or other discipline relating to a union member's rights and

6   therefore subject to the specific due process guarantees of § 101(a)(5) of the LMRDA, 29 U.S.C.

7   § 411(a)(5)."  *Id.* at *4.   The court held that "the record is clear that what was ordered was

8   restitution—the re-payment of monies improperly charged to the union—rather than a penalty

9   affecting membership rights," and granted summary judgment in favor of the union.  *Id.*

10       *In re Scheer* did not address union discipline.  *See generally In re Scheer*, 819 F.3d 1206.

11   Instead, that case dealt with an attorney who had failed to refund a client $5,775 pursuant to the

12   terms of an arbitration award.  *Id.* at 1208.   The State Bar of California suspended the attorney's

13   law license and, after she discharged the underlying debt in bankruptcy, the attorney sought

14   reinstatement.  *Id.* at 1208–09.   Although the bankruptcy court held that the order to repay

15   $5,775 was nondischargeable as a fine under 11 U.S.C. § 523(a)(7), the Ninth Circuit concluded

16   that the arbitration award was purely compensatory.  *Id.* at 1209–11.   The Ninth Circuit,

17   emphasizing the fact that the $5,775 award did not include costs or fees assessed for disciplinary

18   reasons, held as follows:

19
20          [T]he debt at issue was effectively the amount that Scheer
     improperly received from a client, but did not pay back. At its
     core, the $5775 is not a fine or penalty, but compensation for
21   actual loss. Try as we might, we cannot stretch the language
     of section 523(a)(7) to cover the fee dispute at issue here, even
22   though we may disapprove of Scheer's conduct.

23   *Id.* at 1211.

24       The court finds that Hanley instructing Mendoza to repay Local 1637 $5,865.60 for

25   overpayment of his salary is purely compensatory.   No additional costs or fees assessed for

26   disciplinary reasons when computing that amount.  (*See* ECF No. 155-3 at 11 ("[I]n the case of

27   Jose Mendoza, I think you are trying to inaccurately characterize overpayments that he received,

28   and the money that he needs to pay back . . . as . . . a fine. Well, that's not a fine at all. That is

**James C. Mahan**
**U.S. District Judge**

- 31 -

1  money that he owed the local union.")).  Indeed, the $5,865.60 accounted for "overpayment

2  during the 13-week period after . . . Hanley first raised the matter with [Mendoza]" (ECF No.

3  135 at 7 n.6); it was only a fraction of the estimated $144,909.08 that Mendoza overpaid himself

4  (ECF No. 147 at 3).

5      Thus, the court concludes that the order to repay Local 1637 is, as the orders in *Mack* and

6  *Scheer* were, purely compensatory.  Because the repayment order is compensatory, it is not a

7  disciplinary action subject to section 12.5 of the ATU CGLs.  As a result, summary judgment is

8  appropriate as to claim 1 on the basis of the repayment order.[20]

9              *ii.  Removal from office*

10     The last basis for Mendoza's first claim is the allegation that his—and the rest of the

11 executive board's—removal from office was a disciplinary action in which the officers were not

12 afforded a hearing.  Plaintiffs buttress their argument by relying on Hanley's deposition, in

13 which he testified that he "almost always imposes trusteeships because of the actions of a union

14 officer, never files charges, and never accords those officers a full and fair hearing."  (ECF No.

15 147 at 11).  By Mendoza's estimation, "[t]his evidences an epidemic of improper process when

16 this international labor union imposes trusteeships."  *Id.*

17     The evidence mandates the opposite conclusion.  The executive board's removal was not

18 the result of an "epidemic of improper process," it resulted from the operation of the ATU CGLs.

19 As the ATU defendants correctly note, "it is [s]ection *12.6* of the CGL[s]—not [s]ection 12.5—

20 that governs trusteeships, and [s]ection 12.6 makes clear that [p]laintiff was not disciplined when

21 the trusteeship was established."  (ECF No. 135 at 20 (emphasis in original)).  The ATU

22 defendants explain that "the suspension of the individual officers was the necessary consequence

23

24

---

25     [20]  The court notes that Mendoza relies heavily on the DOL OLMS report, which was
       issued in September 2018, well after the actions underlying this controversy concluded.  (*See,*
26     *e.g.,* ECF No. 140 at 6–7).  As Mendoza acknowledges, *id.*, the OLMS report concluded that
       "[o]verall, the investigation revealed too much contradiction concerning Mendoza's authorized
27     salary rate and not enough evidence to make a determination that Mendoza was willfully
       overpaid."  (ECF No. 140-4 at 9).  The fact that the OLMS determined that Mendoza was not
28     willfully overpaid for the purposes of a criminal investigation does not change the court's
       analysis as it pertains to the reasonableness of the ATU defendants' actions at the time or the
       merits of Mendoza's civil claims.

James C. Mahan
U.S. District Judge

1    of the fact that the functions of the local union passed to the trustee after the trusteeship was

2    established." *Id.* (citing ECF No. 135-2 at 13).

3        A reading of section 12.6's plain language does not suggest that any of the officers are

4    automatically charged with wrongdoing when a trusteeship is imposed, nor does it even suggest

5    that such officers have done anything wrong.  Indeed, although a trusteeship may be imposed "to

6    correct corruption or financial malpractice, including mishandling or endangering union funds or

7    property," a trusteeship may be imposed to "carry out the legitimate objectives of the IU . . . ."

8    (ECF No. 135-2 at 10–11).  Nothing in section 12.6 suggests that further disciplinary actions

9    must be or can be taken against the individual officers. Instead, Section 12.6 of the ATU CGLs

10   expressly provide as follows:

11           When a trusteeship is imposed, the functions of the officers of the
             subordinate body shall be suspended and their functions shall pass

12           to the trustee. . . . If the GEB determines after a hearing that the
             trusteeship is justified, and thereby ratifies the trusteeship, all

13           offices within the subordinate body shall immediately become
             vacant. If the GEB determines that the trusteeship was not

14           justified, or should not continue, the suspended officers shall be
             restored to their prior offices without loss of salary or benefits,

15           unless otherwise determined in accordance with the procedures set
             forth in this Constitution.

16

17   (ECF No. 135-2 at 13).  Thus, the executive officers' suspension and possible removal from their

18   respective positions are not a disciplinary action, they are an ancillary consequence of a

19   trusteeship—a consequence that occurs automatically by operation of the CGLs.

20       Therefore, the court finds that Mendoza was not "disciplined" within the meaning of

21   section 12.5.  Accordingly, the court grants summary judgment as to the removal of the

22   executive officers.  The court, having granted summary judgment as to both grounds, dismisses

23   claim 1.

24                    *2.   Claim 2*

25       First, the court notes that Mendoza's second claim is moot insofar as it requests

26   injunctive relief because the trusteeship has terminated.  *See Mendoza I*, district court case no.

27   2:17-cr-02485-JCM-CWH, Ninth Cir. case no. 17-17429 (ECF No. 76) (Ninth Circuit order

28   holding that Mendoza's interlocutory appeal regarding injunctive relief is moot).  However,

James C. Mahan
U.S. District Judge

1   Mendoza argues that his claim remains valid because he pleaded damages stemming from the

2   ATU defendants' alleged "breach of the ATU International Constitution in imposition of the

3   trusteeship in [c]ount two." (ECF No. 147 at 7). Thus, the court now determines whether the

4   ATU defendants fraudulently contravened the ATU CGLs when implementing the trusteeship.

5        The ATU defendants respond to Mendoza's argument regarding the claim 2 as follows:

6        The record clearly establishes that all procedural requirements of
         Section 12.6 were satisfied. On April 10, 2017, Local 1637 was
7        placed into temporary trusteeship upon a vote by a majority of the
         GEB, in response to IP Hanley's recommendation. The ATU held
8        a hearing within 30 days after the establishment of the temporary
         trusteeship; the officers and members of Local 1637, including
9        Plaintiff, received notice of the time, place, and subject of the
         hearing; the hearing was presided over by a hearing officer who
10       was not involved in the decision to impose the temporary
         trusteeship; Plaintiff testified at the hearing, cross-examined each
11       of the witnesses called by the ATU, called an additional witness of
         his own, introduced documentary evidence into the record, and
12       presented extensive argument both at the hearing and in a post-
         hearing brief; the Hearing Officer submitted a detailed report with
13       her findings and recommendations to the GEB; and the GEB
         issued its decision within 45 days of the hearing. None of these
14       facts can reasonably be disputed. While Plaintiff asserts that ATU
         breached its constitution by "refusing to permit Mr. Mendoza to
15       cross-examine ATU's witnesses," this is plainly contradicted by
         the trusteeship hearing transcript, which shows that Plaintiff
16       conducted extensive crossexamination of every witness called by
         ATU during the hearing.

17

18   (ECF No. 135 at 23 (footnote and internal citations omitted)).

19        The court has already reviewed and articulated the facts of this case as they pertained to

20   the institution of the trusteeship and need not reiterate them here. *See supra* Section I. The court

21   has already discussed that the 2012 bylaws were the operative Local 1637 bylaws and that,

22   regardless of which set of bylaws were operative, Mendoza was entitled only to the operator rate.

23   *See generally supra.* Although Mendoza contends otherwise, this overpayment was grounds for

24   ATU to impose a trusteeship over Local 1637,[21] and ATU complied with the procedural

25   requirements of section 12.6.

26

27   _____

28       [21] The court again notes the express language of section 12.6, which allows ATU to
     impose a trusteeship "to correct corruption or financial malpractice, including mishandling or
     endangering union funds or property." (ECF No. 135-2 at 10–11).

1    Accordingly, the court grants the ATU defendants' motion for summary judgment as to

2    claim 2.[22]

3                   3.   *Whether the ATU defendants' interpretation of the ATU CGLs is in*

4                          *bad faith*

5    Mendoza argues that the ATU defendants "are not entitle[d] to deference in the

6    interpretation of the ATU CGLs if that interpretation conflicts with documentary evidence

7    demonstrating that [its] interpretations are being made in bad faith." (ECF No. 147 at 21

8    (capitalization omitted)). Mendoza further argues that "there is an overwhelming amount" of

9    such evidence and that the ATU defendants' interpretation of the CGLs is "self-serving." *Id.* at

10    21–30. Admittedly, the court's analysis of Mendoza's two claims relied on a deferential review

11    of ATU's interpretation of the CGLs. Thus, the court finds it necessary to explain why it does

12    not find the ATU defendants' interpretation to be in bad faith.

13    Rather than argue the interpretation of either section 12.5 or 12.6, Mendoza argues that

14    ATU is interpreting the CGLs in bad faith because it did not have authority under section 8 to

15    respond to the Local 1637 members' complaints in the first place. (ECF No. 147 at 21–30).

16    Mendoza's meandering argument also incorporates a variety of other cases filed against ATU

17    regarding the operation of other sections of the CGLs. *See id.*

18    Section 8 of the ATU CGLs provide that "[t]he [International President] shall decide all

19    questions and appeals from the [Local Unions]." (ECF No. 135-2 at 5). Although section 8 lists

20    only "local unions," ATU Assistant General Counsel Daniel B. Smith testified, as ATU's Rule

21    30(b)(6) witness, that "a local union member can bring an issue of concern to the International

22    president. And the International president, exercising his authority under Section 8 of the

23    CGL[s], can answer a question." (ECF No. 155-3 at 9). Smith later reemphasized this

24    interpretation, explaining that "[local union members] have the right to bring a question to the

25    attention of the International president." *Id.* at 14.

26

27    _____

28        [22] As a result of this ruling, the court also denies Mendoza's motion for partial summary judgment. (ECF No. 140)

1    First, the court accords no weight to Mendoza's arguments and authorities pertaining to

2    sections of the CGLs which are patently inapplicable to the instant case. The ATU defendants

3    note as follows:

> Plaintiff first cites to instances of a challenge or potential challenge
> to a local union election. Election challenges, however, are
> governed by a specific provision of the CGL[s]—Section 14.8—
> which expressly requires that such challenges be submitted to the
> local union's executive board for a decision and are "subject to
> final ruling by the [local union] membership." That the ATU has
> interpreted Section 14.8 to require a final local-union decision on
> an election challenge before the ATU can adjudicate an appeal thus
> has no bearing on the ATU's interpretation of Section 8, which
> contains no similar requirement

> Plaintiff next cites to challenges to disciplinary charges that were
> being processed within a local union. Like election challenges,
> disciplinary charges filed within local unions are governed by a
> specific section—Section 22.6—of the ATU Constitution. Section
> 22.6 requires that when a local union member contests a trial
> board's decision on charges, the local union membership must
> decide whether to uphold the decision by majority vote, subject to
> appeal to the ATU under Section 23 of the ATU Constitution.
> Pursuant to this provision, the International President will not
> interject himself into ongoing disciplinary charges within the local
> union. Because there were no disciplinary charges pending against
> Plaintiff at Local 1637 when IP Hanley investigated the member-
> complaints . . ., the examples of how IP Hanley has handled
> situations in which disciplinary charges were pending within the
> local is simply irrelevant to the member-complaints at issue here.

19    (ECF No. 155 at 12–13).

20    Thus, the court is left with Mendoza's summary argument that section 8 did not authorize

21    Hanley or ATU to get involved when ATU received complaints from Local 1637 members. This

22    does not address—and certainly does not constitute "an overwhelming amount" of evidence

23    regarding—the interpretation of section 4, regarding the president's pay, section 12.5, which

24    addresses disciplinary actions, or section 12.6, which governs the imposition of trusteeships.

25    Nonetheless, the court notes that ATU Assistant General Counsel Smith testified that the

26    complaints sent by Local 1637 members were considered "questions." (ECF No. 155-3 at 15

27    ("I'm not aware if she had an appeal, but I do know she had a question.")). Smith explained the

28    difference between a "question" and an "appeal" as follows:

**James C. Mahan**
**U.S. District Judge**

1
2
3
4
5

> I would characterize what I understand to be [the Local 1637 member's] letter as it's been described—now we haven't seen it here today, as a question, not as an appeal.  I would take an appeal to be an appealing what we sometimes will call a final decision of a local union.  And that suggests either the vote of the membership, or the vote of the executive board, where there's been no quorum in the meeting following that executive board meeting provide that that business would have been reported to the membership at that meeting, had there been a quorum.

6
7
8

*Id.* at 23.  When explaining that determination, Smith specifically contrasted the question posted to Hanley and ATU by the Local 1637 member with an "appeal" under Section 23.  *See id.* at 24. Smith also affirmed that ATU has stood by this interpretation "for decades."  *Id.* at 22–23.

9
10
11
12

Therefore, Mendoza's argument rests on an interpretation of section 8 in which the international president could respond only to "appeals."  Mendoza's interpretation disregards the international president's ability to answer "questions."  Mendoza's disagreement with ATU's interpretation of section 8 does not amount to evidence of bad faith.

13
14
15

Accordingly, the court finds that the ATU defendants' interpretations of the provisions of the CGLs at issue in this case were reasonable and properly afforded deference under this circuit's precedent.  Mendoza's arguments to the contrary are unavailing and inapposite.

16

## IV.    Conclusion

17

Accordingly,

18
19

IT IS HEREBY ORDERED, ADJUDGED, and DECREED that plaintiff's motion to amend (ECF No. 67) be, and the same hereby is, DENIED.

20
21

IT IS FURTHER ORDERED that Judge Hoffman's R&R (ECF No. 117) be, and the same hereby is, ADOPTED, consistent with the foregoing.

22
23

IT IS FURTHER ORDERED that plaintiffs' objections to Judge Hoffman's order (ECF No. 121) be, and the same hereby are, OVERRULED.

24
25

IT IS FURTHER ORDERED that the MKA defendants' motion for summary judgment (ECF No. 112) be, and the same hereby is, DENIED as moot.

26
27

IT IS FURTHER ORDERED that plaintiffs' countermotion to strike (ECF No. 125) be, and the same hereby is, DENIED as moot.

28

**James C. Mahan**
**U.S. District Judge**

1   IT IS FURTHER ORDERED that the ATU defendants' motion for summary judgment

2   (ECF No. 135) be, and the same hereby is, GRANTED.

3   IT IS FURTHER ORDERED that the ATU defendants' motion for summary judgment

4   (ECF No. 136) be, and the same hereby is, DENIED as moot.

5   IT IS FURTHER ORDERED that the KTA defendants' motion for summary judgment

6   (ECF No. 137) be, and the same hereby is, DENIED in part as moot and GRANTED in part,

7   consistent with the foregoing.

8   IT IS FURTHER ORDERED that plaintiffs' motion for partial summary judgment (ECF

9   No. 139) be, and the same hereby is, DENIED.

10   IT IS FURTHER ORDERED that plaintiffs' motion for partial summary judgment (ECF

11   No. 140) be, and the same hereby is, DENIED.

12   IT IS FURTHER ORDERED that plaintiffs' motion to reconsider (ECF No. 151) be, and

13   the same hereby is, DENIED.

14   The clerk is instructed to enter judgment against plaintiffs and in favor of defendants on

15   all claims and close the case.

16   DATED May 4, 2020.

17   _____

18   UNITED STATES DISTRICT JUDGE

19

20

21

22

23

24

25

26

27

28